IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 22, 2015 Session

## CURTIS CECIL WAYNE BOLTON v. STATE OF TENNESSEE

Appeal from the Criminal Court for Campbell County
No. 10567      Ben H. Cantrell, Senior Judge

No. E2014-00559-CCA-R3-PC - Filed July 29, 2015

The Petitioner, Curtis Cecil Wayne Bolton, was convicted of the first degree premeditated murder of his two and one-half year old son and received a life sentence. In the present post-conviction action, the post-conviction court granted relief on two ineffective assistance of counsel claims but denied relief on the Petitioner's remaining ineffective assistance of counsel claims.  In this appeal, the State contends that the post-conviction court erred by granting relief for ineffective assistance of counsel in failing to seek a severance and in failing to object to the State's bolstering and vouching for the codefendant's testimony. The Petitioner also contends that the post-conviction court erred by denying relief on his ineffective assistance of counsel claims related to failure to consult with a medical expert and investigate the medical evidence, failure to advise the Petitioner accurately during plea discussions regarding the sentence he would face if convicted, and failure to object to prosecutorial misconduct.  We affirm the judgment of the post-conviction court granting post-conviction relief on the ground that trial counsel was ineffective for failing to seek a severance.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Robert E. Cooper, Jr., Attorney General and Reporter; John H. Bledsoe, Senior Counsel; Deshea Dulany Faughn, Senior Counsel; Lori Phillips-Jones, District Attorney General; and Michael Olin Ripley, Assistant District Attorney General, for the appellant, State of Tennessee.

Jessica Van Dyke, Nashville, Tennessee, for the appellee, Curtis Cecil Wayne Bolton.

# OPINION

## Conviction Proceedings

The record of the Petitioner's conviction proceedings, which was made part of the post-conviction record, reflects that the Petitioner's son died at the University of Tennessee Medical Center on November 23, 1995, from blunt force head trauma. The victim had other injuries, as well, and the medical evidence showed that the victim's injuries were non-accidental. The Petitioner and his girlfriend, Lisa Boyer, were charged with first degree premeditated murder and were tried jointly. Ms. Boyer testified for the State at the trial.

The evidence showed that Ms. Boyer and the Petitioner lived together. They had a four-week-old daughter, and Ms. Boyer was still recovering physically from a difficult delivery. The victim lived in the home, and although he was not Ms. Boyer's child, she cared for him during the day when the Petitioner worked. Ms. Boyer was 5'1" and weighed ninety-five pounds. The Petitioner was 5'8" and weighed 148 pounds.

Police officers testified about the Petitioner's and Ms. Boyer's pretrial statements. An officer who went to the home within hours of the injured victim's arrival at the hospital testified that Ms. Boyer stated the victim fell out of a highchair. Ms. Boyer told the officer that earlier in the evening, the Petitioner had gone to the emergency room because he had injured his finger at work earlier in the day. The victim cried when the Petitioner left the house, and Ms. Boyer got him up to feed him around 11:30 p.m. She put him in his highchair, went to another room to wash the highchair's tray, and heard a loud bang. She found the victim on the floor, and he had a bruise on his temple and was not breathing. She slapped him three times, with the third slap being hard, and he resumed breathing. She called the emergency room and told the Petitioner to come home. The Petitioner returned to the house and took the victim to the emergency room. Ms. Boyer told the officer the victim had not been injured when the Petitioner left the first time to go to the emergency room.

The sheriff testified that the Petitioner was questioned at the sheriff's office and explained that the bandage on his finger was from a work-related injury. The Petitioner said he aggravated this injury when he swatted the victim's bottom because the victim would not listen.

A neighbor testified that on the night before the victim's death, she heard thumps coming from the Petitioner and Ms. Boyer's trailer about thirty minutes after she went to bed

around 8:30 or 9:00 p.m. She had looked outside and had seen a man and woman running back and forth in the hall of the Petitioner and Ms. Boyer's trailer.

When called as a State's witness, Ms. Boyer testified that the Petitioner was not a good father, did not work regularly, did not buy groceries for his family, and did not contribute to the household financially other than by paying rent. She said she received governmental assistance.

Regarding the events of November 22, 1995, Ms. Boyer testified that the victim had been weak, had fever, and had a poor appetite for a few days. Although three doctor's appointments were made for the victim, the Petitioner had cancelled them and would not allow her to take the victim to the doctor. She said the Petitioner came home from work around 6:30 p.m. with an injured finger. The Petitioner left to run errands, and during his absence, Ms. Boyer started to give the victim a bath and noticed he had "massive" bruises on his chest. When the Petitioner returned, he went into another room to change the victim's clothes and talked by telephone with his sister behind a closed door. Ms. Boyer said that the victim did not want to eat dinner and gagged on his juice. She said that the Petitioner took the victim from his highchair and spanked him repeatedly and that she finally told the Petitioner to leave the victim alone. She said that the Petitioner continued spanking the victim as he walked the victim to the victim's bedroom. She said that the Petitioner hit the victim so hard that the victim started to fall and that the Petitioner grabbed the victim by his collar and carried him into the bedroom. She walked past the bedroom and saw the Petitioner pointing at the victim and talking to him. She heard a loud thump from the bedroom. When she went into the bedroom, the Petitioner was holding the victim by his ankle and wrist. The Petitioner threw the victim into the wall above the victim's bed. The victim fell face-forward to the bed and was limp. Ms. Boyer said the Petitioner forcefully spanked the victim's bottom. She said she screamed at the Petitioner that he had done enough. She said the Petitioner left the bedroom and stated, "I warped him so hard, I can't believe he's not crying, I warped him so hard I hurt my hand."

Ms. Boyer testified that she told the Petitioner to go to the hospital. She tried to get the victim out of bed to feed him, but he was unresponsive. She helped him out of bed and noticed that he walked with his legs crossed, that he slouched, and that he scooted. She said the victim moaned when she told him to get into his highchair. She tried to pick up the victim, but she stumbled because she was also holding her daughter, causing the victim's head to bump the wall. She gave the victim some food and noticed he stared straight ahead and had dilated pupils. She said he started to slide back and down in the highchair. She went to the bathroom to get the highchair tray and heard a thump. When she returned to the kitchen, the victim was on the floor. She said the victim was not breathing and did not have a pulse. She splashed cold water on him and slapped him lightly twice and hard once, and

he began breathing. She noticed large bruises on the victim's face. She called the emergency room and spoke with the Petitioner, who told her not to call an ambulance because he would be home in a few minutes.

Ms. Boyer testified that she did not tell the police about the Petitioner's actions when an officer came to the house around 3:00 a.m. on November 23 because she was afraid of the Petitioner. She said she told a detective about the Petitioner's actions on November 23 around 4:55 p.m. She acknowledged she gave the statement implicating the Petitioner after she had been arrested and jailed for first degree murder.

The Petitioner testified that he injured his hand at work on November 22. He said that when he went home after work, Ms. Boyer told him the victim had fever earlier in the day. He said the victim looked as if he did not feel well and was not responsive. The Petitioner said he bathed the victim and left to run errands. He returned home and noticed the victim did not eat dinner but drank juice. The Petitioner said he watched television with the victim until he left around 10:30 p.m. to go to the emergency room. He said he put the victim to bed before leaving.

The Petitioner testified that while he was at the emergency room, Ms. Boyer called and said the victim had fallen from the highchair. He said that he went home and that it never occurred to him to get an ambulance. He went home and found the victim face-down on the bed. He said the victim was pale, limp, helpless, and had dilated pupils. He took the victim to the emergency room.

The Petitioner said his discipline methods included a slight swat or a smack to the victim's hand. He denied throwing the victim into a wall and said he did not swat the victim's bottom on November 22. He said he and Ms. Boyer agreed that he would discipline the victim and that she would not.

On cross-examination, the Petitioner admitted that despite his earning $4780 in a four-month period, he filed an application for governmental assistance that stated his income was $480 per month. He acknowledged that he had called two or three times to check on his daughter, who had been in Department of Human Services' custody for a year, and that he had not called to check on his daughter at all in the past several months. Ms. Boyer's mother's boyfriend testified that in contrast, Ms. Boyer called almost nightly to check on the child and that Ms. Boyer visited the child as often as she was allowed. *See State v. Curtis Cecil Wayne Bolton*, No. 03C01-9707-CR-00255, 1999 WL 93107, at *1-12 (Tenn. Crim. App. Feb. 25, 1999), *perm. app. denied* (Tenn. Sept. 13, 1999).

-4-

The record of the trial proceedings reflects that at the end of the State's proof and immediately after Ms. Boyer testified, the prosecutor made the following announcement:

> If it please the Court and the members of the jury, the State of Tennessee rests. At the conclusion of our proof, we elect pursuant to Section 39-11-401 of the Tennessee Code that the defendant, Curtis Bolton, based on this proof is criminally responsible as the party who committed the offense and we further elect, Your Honor, pursuant to section 39-11-402, that Lisa Boyer is also criminally responsible for the conduct of another, as an aider and assister [sic].

The record of the trial proceedings also reflects that the jury acquitted Ms. Boyer and convicted the Petitioner.

In the appeal of the conviction, the Petitioner raised issues related to the sufficiency of the evidence to support the conviction, a juror's failure to reveal he had been a college roommate of an assistant district attorney general, cross-examination of the Petitioner by Ms. Boyer's attorney about the Petitioner's previous convictions and charges for passing worthless checks, admission of a diagram of the victim's body and the medical examiner's references to photographs that were not admitted, and the prosecutor's use of Biblical references during closing argument. This court denied relief. *See id.* at *13-19.

## Post-Conviction Proceedings

The Petitioner filed a pro se petition for post-conviction relief. For reasons that are not explained in the record, the Petitioner's post-conviction case remained pending in the lower court for over a decade before the hearing. The record reflects that the Petitioner had a succession of appointed attorneys and that special judges were appointed. Some of the delay was attributable to disputes between the Petitioner and his appointed attorneys.

At the post-conviction hearing, the Petitioner testified that before the trial, he received a plea offer that involved a twelve-year sentence. He said trial counsel advised him of the offer at a meeting at which the Petitioner's mother and sister-in-law were present. He did not recall the conviction offense proposed by the plea offer, and although he did not recall the range classification of the offer, he assumed it was 100% because he was told it involved twelve years "to serve." He said that in the meeting, counsel advised him that if he were convicted of first degree murder at a trial, he would receive a life sentence but would be eligible for a parole hearing after serving twenty-five years. He said he was told that if he kept his "nose clean," he had "a pretty good shot of getting out at 25 years." He said he weighed the options of accepting a plea offer versus going to trial in light of the difference

between a twelve-year sentence and parole eligibility after twenty-five years. He said that considering the "small difference" between the two, he wanted to "go to bat" for the victim. He said that he "[m]ost certainly" would have accepted the offer and would not have gone to bat for the victim if he had known he faced the possibility of serving fifty-one years in prison if convicted at a trial. He said he did not learn that he would have to serve fifty-one years until a few months after the conviction and his transfer to the Department of Correction. He acknowledged that in the meeting about the offer, his mother said the Petitioner was not going to accept the offer. He said that she helped but did not make the final decision. The Petitioner said it was up to him to make the decision and that he was asked "point blank" for his decision. He said he understood that he could accept an offer without admitting guilt.

The Petitioner testified that he and trial counsel did not discuss the prospective jurors. He said he would have been concerned if he had known about a juror and an assistant district attorney general having been college roommates. He said he did not learn of this information until after the trial.

The Petitioner testified that he and trial counsel did not discuss a severance of his case from Ms. Boyer's case before or during the trial. He said he never heard the words "severance" or "motion to sever" until after the trial. He said that Ms. Boyer and the State pursued the same theory at the trial and that if Ms. Boyer's testimony were believed, he would be convicted. He said he and counsel did not discuss the use of medical experts or consultants. He did not recall if they discussed how Dr. Blake would testify.

The Petitioner testified that he did not kill the victim, that he had always said he did not, and that he did not know what happened to the victim. He agreed that his theory was that Ms. Boyer had to have been the person who injured the victim. He acknowledged that his testimony did not go well and that he had difficulty with cross-examination. He said this was not trial counsel's fault.

Attorney Thomas Dillard, an expert in trial practice, testified that in July 1993, the sentencing law for first degree murder was changed to provide that a life sentence was a sixty-year sentence, requiring a defendant to serve 60%, or 36 years, before being released. He said that in addition, a defendant could earn 15% sentence credits that could reduce the sentence to twenty-five years' service. He said that a person who did not have sufficient sentence credits to be released might still be paroled. He said that effective July 1, 1995, the law was amended to eliminate parole for first degree murder. He said the percentage of service was increased to 100% of sixty years, although a defendant could still earn up to 15% sentence credits, which could result in release after fifty-one years. He said the provisions

-6-

providing for parole and the possibility of release after service of twenty-five years were eliminated.

In Mr. Dillard's opinion, failure to advise a client of the maximum sentence the client faced if convicted at a trial was ineffective assistance of counsel. He said this was particularly the case if the client received a plea offer. He said he would not advise a client to plead guilty if the client insisted he was not. He said, though, that defense counsel had a duty to advise a client of all plea offers without regard to the client's interest in an offer. He said defense counsel likewise had a duty to advise a client accurately about the possible sentence and its effect.

Mr. Dillard testified that his practice under the prior first degree murder sentencing law was to advise clients that parole was difficult to obtain and that the victim's relatives would oppose parole. He agreed he told clients that despite the possibility of parole, they would likely spend most of their lives in prison and might never receive parole.

Mr. Dillard testified that he had never seen a criminal case in which a codefendant testified for the State in a joint trial. He said that as a defense attorney, if he became aware before the trial of a situation in which this would occur or if he learned it would occur from the opening statements, he would move for a severance. He said that if his client's codefendant testified for the State, he would move for a mistrial, even if he knew the trial court would deny it. He acknowledged that he would not have a basis for objecting to a codefendant's testifying for the State. He said that a situation in which two defendants were on trial together and one testified for the State was extremely prejudicial to the defendant who did not testify for the State. He said that in cross-examining a testifying codefendant, it was important to impeach the codefendant's testimony by showing bias or prejudice, offers from the State, and any other relevant matters.

Gregory Davis, M.D., an expert in forensic pathology, testified he reviewed the victim's autopsy report and the trial testimony of Doctors Blake and Clawson, who testified for the State. He said he agreed to work on the Petitioner's post-conviction case *pro bono* because he thought Dr. Blake's autopsy report contained conjecture outside the bounds of knowledge in forensic pathology that needed to be addressed.

Dr. Davis testified that he agreed with Dr. Blake's determinations that the cause of death was blunt force head trauma and that the manner of death was homicide. He said, though, that he questioned Dr. Blake's opinions about the ages of some of the victim's contusions. He said that according to current medical knowledge, determining the age of a bruise was problematic. He said that people bruise and heal at different rates and that it was

difficult to determine the ages of bruises, except that an expert might determine that injuries leading to multiple bruises did not occur at the same time.

Regarding Dr. Blake's testimony that "at least an hour or so could have passed" between the victim's sustaining a head injury and the appearance of symptoms, Dr. Davis testified that Dr. Blake's opinion was not scientifically substantiated and was speculative. He said it was impossible to pinpoint the time of the victim's head injury. Dr. Davis disagreed with Dr. Blake's testimony that the victim's injury did not occur suddenly from a massive brain bleed and that had that occurred, the victim would have died by the time he was seen at the emergency room. He said that no guideline existed regarding the amount of time a child might live after a massive brain bleed and noted that some children lived for days in the pediatric intensive care unit. Dr. Davis did not think any pathologist could determine exactly when the victim's injuries occurred before the victim came to the emergency room.

Dr. Davis agreed with Dr. Blake's assessment that the victim's unconscious state and fixed and dilated pupils when the victim presented at the emergency room were early signs of brain damage. He agreed with Dr. Blake's testimony that the victim was comatose due to building pressure in the victim's head.

Dr. Davis testified that although he would not say it was impossible for a highchair fall to cause the victim's fatal injuries, he thought it was highly unlikely. He thought Dr. Blake's testimony that the victim's injuries were sustained from an amount of force equivalent to a fall from one to two stories was "dramatic" and said that analogies of this nature had fallen out of favor in the past decade, although they had been used by pathologists in the 1990s when the Petitioner's trial took place. He said a toddler who fell from standing on a podium and hit his head had a good chance of dying. Regarding Dr. Blake's testimony about the ages of the victim's bruises, Dr. Davis said that even in the 1990s, he was uncomfortable providing opinions of this nature.

Regarding Dr. Blake's testimony that the victim's injuries were consistent with having been thrown against a wall more than once, Dr. Davis testified that had he been called as a witness, he would have been able to testify that the injuries were consistent with a number of other things. He thought Dr. Blake alluded to the possibility of the injuries occurring in another scenario.

Dr. Davis testified that had he been called as a witness at the Petitioner's trial, he would have been able to state the same opinions as those expressed in his post-conviction hearing testimony. He said that in several cases in which he served as an expert witness, he

had been allowed to remain in the courtroom and evaluate other medical testimony. He said he had helped attorneys formulate cross-examination questions.

Dr. Davis testified that overall, he agreed with most of Dr. Blake's testimony. With respect to his disagreements, he did not think Dr. Blake testified falsely or was misleading. He said pathologists might look at the evidence objectively but disagree on its interpretation.

Dr. Davis testified that no evidence pointed to a conclusion that the victim's injuries were inflicted by a 5'8", 150 pound man. He said that likewise, no evidence excluded the possibility that they were inflicted by a petite woman. He said that he would have been able to testify that it was possible a petite woman could have thrown the victim into the wall with sufficient force to cause the injuries.

Jessie Stalnaker testified that she had been married to the Petitioner's brother, who passed away in 2007. Regarding the Petitioner's pretrial proceedings, she recalled conversations at home and at trial counsel's office about whether the Petitioner would accept the State's plea offer. She said she went with the Petitioner and the Petitioner's mother to meet with counsel about the offer. She thought counsel's assistant was also present at the meeting. She said counsel stated that the offer was for twelve years "to serve." She did not recall the offense to which the offer required the Petitioner to plead guilty. She said the Petitioner's mother was not pleased with the offer and told the Petitioner he was not going to accept the offer. Ms. Stalnaker said the Petitioner's mother asked counsel what the Petitioner "was looking at." She said counsel stated that the Petitioner faced a life sentence and would be eligible for parole after serving twenty-five years. Ms. Stalnaker said the Petitioner's mother did most of the talking in the meeting. She did not recall the Petitioner's saying much.

Ms. Stalnaker testified that she recalled the details regarding parole eligibility because it was discussed frequently for several days. She said that after the meeting, the Petitioner's father calculated that the Petitioner would be eligible for parole at age fifty. She said she found out one or two days after the Petitioner's conviction that trial counsel's advice about parole eligibility was incorrect. She said she was at the Petitioner's parents' house and learned the correct sentencing information from her son, who was employed by the district attorney general. She said the Petitioner also learned the correct information, although she did not know when. She said it was not years after the conviction. She said that she had always believed the victim's death was accidental and that the Petitioner had always denied killing the victim.

Trial counsel testified that he was employed previously as an assistant public defender and that he represented the Petitioner in the conviction proceedings. He said that he had not

been able to review the public defender's file regarding the case because it could not be located but that he had reviewed the transcript of the trial.

Trial counsel testified that, after the trial, he learned of a juror's connection with one of the assistant district attorneys general. He said that he raised the issue in the motion for a new trial and that the juror and the assistant district attorney general testified at the hearing. He did not recall anything significant about the juror during jury selection. He said his habit was to discuss prospective jurors with his clients. He did not recall if after the trial, he and the Petitioner discussed the Petitioner's thoughts about the connection between the juror and the assistant district attorney general.

Trial counsel testified that he did not obtain a medical expert to review the evidence. He acknowledged he had no medical training or experience. He said he had never conducted a hearing pursuant to *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993), regarding the admissibility of scientific expert evidence. He did not recall whether he reviewed any medical literature provided by Doctors Blake and Clawson but said he would have if it was provided. He said that he met with Dr. Blake before the trial and that Dr. Blake answered his questions. He said that based upon the pretrial interview, he was not surprised by Dr. Blake's testimony.

Regarding preparing the Petitioner for the trial, trial counsel testified that he and the public defender's investigator questioned and cross-examined the Petitioner in the courtroom and familiarized him with the courtroom process. Although he could not specifically recall reviewing the Petitioner's pretrial statements with him, he was sure he did. He said he also talked to the Petitioner at counsel's office.

Trial counsel testified that the defense theory was that the Petitioner was not home when the victim was injured and therefore could not have inflicted the injuries and that the Petitioner loved the victim. He said they tried to show that the Petitioner hurt his finger at work, went home, talked to Ms. Boyer, went to the hospital, received a call that the victim had fallen, went home, and took the victim to the hospital. He said that he had reviewed the defense strategy with the Petitioner but that ultimately, the jury did not accept it. He did not recall whether he knew going into the trial that food stamps, AFDC, and WIC would be mentioned repeatedly.

Trial counsel acknowledged a letter to the district attorney general as bearing his signature, although he had no independent recollection of the letter. The letter requested the district attorney general's assistance in correcting the Department of Correction's incorrect classification of the Petitioner's sentence as life without parole.

-10-

Regarding his recollection of when he learned Ms. Boyer would testify for the State, trial counsel said that he had been trying to remember and that "the only thing I can come up with is during the trial." He said he thought the Petitioner's and Ms. Boyer's defenses were "on the same page as we went into this trial and then she testified." He said he cross-examined Ms. Boyer about the timing of her release from jail when she changed her story. Although he did not recall the specifics of his conversations with Ms. Boyer's attorney, he said he had the impression Ms. Boyer would support the Petitioner's theory that the victim was injured in a highchair fall when the Petitioner was not home. He agreed that Ms. Boyer testified that the Petitioner was not home when the victim fell from the highchair but that she said the Petitioner threw the victim against a wall and whipped the victim. He acknowledged that at some point during the opening statements, he became aware that Ms. Boyer's defense was not "on the same page" as the Petitioner's defense.

Trial counsel initially said he did not recall whether the State made a plea offer, although he later recalled discussions relative to the offer. He said he advised the Petitioner of the possibility of receiving a life sentence and told him he would spend a "large majority of his life" in prison. He said, though, he was sure he or the private investigator advised the Petitioner of the number of years the Petitioner would have to serve if he received a life sentence. Counsel said the advice would have been in accord with the then-current state of the law. He said the Petitioner stated he was not guilty, would not accept a plea offer, and wanted to "go to trial for" the victim.

Dr. Darinka Mileusnic-Polchan, an expert in forensic pathology, testified for the State. Before her testimony, she reviewed Dr. Blake's autopsy reports, a transcript of his testimony, "a couple of opinions," and evidentiary items she received from Dr. Blake's widow. She said she received a body diagram, the victim's medical records from LaFollette and UT Hospitals, photographs, and "glass lights."[1] She said that after studying these items, she agreed with Dr. Blake's determination of the cause of death as blunt force trauma and the manner of death as homicide. In her opinion, the victim's injuries were non-accidental.

Dr. Mileusnic-Polchan testified that although she agreed with Dr. Blake's description in the autopsy report of the injuries and his overall opinion, he made statements she would not have made. She would not have made the analogies Dr. Blake and Dr. Clawson made to the force of the injury being equivalent to a fall from two or more stories. She said that current medical knowledge was that short falls could result in trauma and could occasionally be deadly. In Dr. Mileusnic-Polchan's opinion, Dr. Blake's testimony was not misleading.

---

[1] We infer from the context that "glass lights" was a transcription error and that the items were glass slides.

Dr. Mileusnic-Polchan testified that the victim's injuries were consistent with his having been thrown into a mobile home wall. She said the injuries were consistent with an impact with a number of hard surfaces. She found it inconceivable that a fall from a highchair would result in internal and external injuries of the magnitude of the victim's injuries. She said the victim had both fresh and "quite numerous" old traumas.

Dr. Mileusnic-Polchan testified that Dr. Blake analyzed samples of the victim's bruises microscopically, which she said was more accurate than determining their ages visually. In her opinion, most of the samples were from traumas that occurred about twenty-four hours before the victim's death between 11:00 a.m. and noon on November 23, 1995. She said that some of the bruises on the lower back and gluteal area could be as much as one week old. In addition, she said a liver laceration was two to three days old.

Dr. Mileusnic-Polchan testified that the victim's "most pertinent" injury was to his head. She said that an injury of this nature would cause a child to act sick, possibly with flu-like symptoms. She said the brain would start to swell at a rate that varied from person to person. She said the child would become lethargic, sleepy, and hard to arouse; would have a poor appetite; and eventually, would slip into a coma. She said that death would occur when the brain swelling herniated through the base of the skull and compressed vital centers in the brain stem.

Dr. Mileusnic-Polchan testified that in her opinion, the victim's head trauma and clavicle fracture occurred twenty-four to forty-eight hours before his death. When asked if the victim's injuries could have occurred about one hour before the victim was seen at LaFollette Hospital, she said she was not comfortable with dating the injuries to twelve to thirteen hours before the death. She said that if she had been called as a witness at the trial, she would have said the victim would have been injured in the morning, around noon, or early afternoon of November 22.

Dr. Mileusnic-Polchan testified that based upon the distribution and extent of the victim's injuries, she did not think they were from childhood play. She noted a pattern of injuries was visible after the victim's head was shaved.

Attorney John Beaty testified that he was a former assistant public defender and that he helped trial counsel investigate the Petitioner's case. He said that they went to the scene, that they met with the Petitioner, and that he thought they met with Dr. Blake.

Mr. Beaty testified that the district attorney general conveyed a plea offer to trial counsel and him shortly before the trial. He said the offer was for a twelve-year sentence and an out-of-range classification as a career or multiple offender. He thought the conviction

offense would be reckless homicide. He said the offer was communicated to the Petitioner and thought the Petitioner's parents were present. He said he and the public defender's investigator were also present. Although he did not recall the specifics of the discussion about the offer, he said that the Petitioner declined to accept the offer and "was going to trial for" the victim. Mr. Beaty thought the Petitioner was advised he would receive a life sentence if he were convicted and did not recall telling the Petitioner the minimum service was twenty-five years. He felt confident the Petitioner understood that if a life sentence were imposed, the Petitioner would likely be in prison for the rest of his life. He did not recall the Petitioner's expressing any interest in entering a guilty plea or engaging in plea negotiations.

After receiving the proof, the post-conviction court granted relief on the Petitioner's claims that trial counsel was ineffective in failing to seek a severance and in failing to object to the State's bolstering of and vouching for Ms. Boyer's testimony. Regarding the Petitioner's claim that he was erroneously advised regarding parole eligibility for a life sentence, the court found that although the Petitioner received erroneous advice, he was not entitled to relief because he failed to provide clear and convincing proof that he would have accepted a plea offer had he received correct advice. The court also denied relief on the Petitioner's claim that counsel was ineffective in failing to consult with a defense medical expert. This appeal followed.

## Analysis

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2012). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2012). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . , are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

# I

The State contends that the post-conviction court erred in granting post-conviction relief on the basis that trial counsel provided ineffective assistance by failing to seek a severance. The Petitioner responds that the court properly granted relief. We conclude that the court did not err in granting relief on this basis.

The evidence at the hearing showed that trial counsel thought until the trial began that the Petitioner and Ms. Boyer were of like mind as regards the defense. Counsel anticipated Ms. Boyer would testify that the victim was injured from a highchair fall when the Petitioner was not home. As we have stated, the trial record reflects that counsel did not request a severance when the prosecutor said in opening statements that Ms. Boyer wanted to tell the jury what happened. The trial record likewise reflects that in her testimony, Ms. Boyer blamed the victim's injuries on the Petitioner and said the police initially misled her by stating that the victim's death resulted from the highchair fall and her resuscitation efforts.

At the time of the Petitioner's trial, Rule 8(c) of the Tennessee Rules of Criminal Procedure provided:

**(c) Joinder of Defendants.** Two or more defendants may be joined in the same indictment, presentment, or information:

(1) if each of the defendants is charged with accountability for each offense included; or

(2) if each of the defendants is charged with conspiracy, and some of the defendants are also charged with one or more offenses alleged to be in furtherance of the conspiracy; or

(3) even if conspiracy is not charged and all of the defendants are not charged in each count if the several offenses charged:

    (i) were part of a common scheme or plan; or

    (ii) were so closely connected in respect to time, place, and occasion that it would be difficult to separate proof of one charge from proof of the others.

Tenn. R. Crim. P. 8(c) (1996). At the time, Rule 14(b)(2) provided:

**(c) Severance of Defendants.**

. . . .

(2) The court, on motion of the State or on motion of the defendant other than under subdivision (c)(1) [pertaining to severance because of a codefendant's out-of-court statement] shall grant the severance of defendants if:
. . . .

(ii) during trial, with consent of the defendant to be severed, it is deemed necessary to achieve a fair determination of the guilt or innocence of one or more defendants.

Tenn. R. Crim. P. 14(c)(2)(ii) (1996). The decision whether to grant a severance is within the trial court's discretion. *State v. Coleman*, 619 S.W.2d 112, 116 (Tenn. 1981).

The test for determining whether a trial court has abused its discretion in denying a severance is "whether or not the defendant was clearly prejudiced

in his defense by being jointly tried with his co-defendants." [*Hunter v. State*, 440 S.W.2d 1, 6 (Tenn. 1969)]. *See State v. Lunati*, 665 S.W.2d 739, 745-746 (Tenn. Crim. App. 1983), *cert. denied,* 466 U.S. 938, 104 S. Ct. 1913, 80 L. Ed. 2d 461 (1984). The record must demonstrate that "the defendant was clearly prejudiced to the point that the trial court's discretion ended and the granting of [a] severance became a judicial duty," [*Hunter*, 440 S.W.2d at 6], before an accused is entitled to a reversal of his conviction.

*State v. Burton*, 751 S.W.2d 440, 447 (Tenn. Crim. App. 1988).

Relative to the severance issue, the post-conviction court found:

> This court is of the opinion that it was not ineffective assistance of counsel to fail to move for a severance initially. The only evidence on the defendants' position prior to trial was trial counsel's testimony that his side believed Ms. Boyer was relying on the same defense and would not testify against Mr. Bolton.

> On the first day of trial, however, when it appeared that Ms. Boyer would be a key witness for the state, the need for a severance became obvious. Then counsel must have realized that he needed to know how Ms. Boyer's story had changed, how to plan the defense in light of the new information and what had induced her to change so dramatically. The Court believes that a motion for severance at that time became imperative.

> It is true that whether to grant a severance is within the discretion of the trial judge, but in the opinion of this Court, under these circumstances, Mr. Bolton was clearly prejudiced and granting a severance would have been judicial duty. [*State v. Caruthers*, 35 S.W.3d 516, 553 (Tenn. 2000)].

The State argues that the Petitioner cannot prevail because he has not shown that the trial court would have granted a severance motion. It argues that the Rules of Criminal Procedure permit a severance during a trial with "consent of the defendants to be severed," but no proof shows Ms. Boyer would have consented to a mid-trial severance. The State's argument relies upon the current language of Rule 14(c)(2)(B). We note, however, that when the trial took place, Rule 14(c)(2)(ii) permitted the court to grant a severance with "consent of the *defendant* to be severed." Tenn. R. Crim. P. 14(c)(2)(ii) (1996) (emphasis added). We conclude that had trial counsel sought a severance on behalf of the Petitioner, Ms. Boyer's consent would not have been required under the then-current provisions of Rule 14.

The State also argues that continuing with the trial without requesting a severance was a strategic alternative available to trial counsel. It argues that the record fails to reflect that a severance was necessary for a fair determination of guilt. We disagree.

In the context of considering an evidentiary matter arising in a joint trial of codefendants for aggravated child abuse and felony murder resulting from the death of their child, our supreme court has observed:

> Neither party has questioned whether the cross-examination of a defendant on a subject by counsel for a co-defendant may "open the door" to further cross-examination on that subject by the State. *Cf. United States v. White*, 887 F.2d 267, 270 (D.C. Cir.1989) ("The prosecution may not gain, through the device of a joint trial, admission against one defendant of otherwise inadmissible evidence on the happenstance that the door to admitting the evidence has been opened by a co-defendant."). *This issue, as well as others addressed in this opinion, underscores the difficulty in pursuing joint trials for co-defendants who are charged with abuse of a child. Neither co-defendant moved for severance in this case. Although we decline to require the severance of the trials of defendants in similar cases, trial courts should give motions to sever serious consideration when such motions are made.*

*State v. Gomez*, 367 S.W.3d 237, 264 n.7 (Tenn. 2012) (emphasis added).

Once it became known in the present case that the codefendant would testify for the State, any basis for sound trial strategy for proceeding in a joint trial disappeared. As the trial progressed, it became apparent that the codefendant and the State were pursuing a common theme casting the Petitioner in a poor light, even beyond the facts related to the charged offense. We note Ms. Boyer's trial testimony that the Petitioner did not support the family, that he had a history of abusing the victim, that she found bruises on the victim's body on the night of the crime, and that she was afraid of the Petitioner. The Petitioner's trial practice expert, Mr. Dillard, testified that in his opinion, a situation in which a codefendant testified against a defendant as a State's witness was prejudicial and necessitated a motion for a severance. He likewise testified to the anomalous nature of this type of prosecution. As we have noted, trial counsel believed going into the trial that Ms. Boyer would testify that the victim was injured when the victim fell from the highchair while the Petitioner was away. Once it became apparent Ms. Boyer would testify for the State, counsel should have recognized that Ms. Boyer's plan to testify as a State's witness was inconsistent with her anticipated testimony and that the Petitioner's defense strategy must be revisited.

-17-

When Ms. Boyer's intent to testify for the State became known, trial counsel should have realized the inherent prejudice in the State's being the proponent of testimony of a codefendant who was on trial in the same proceeding, particularly given the facts of this case. We acknowledge that the Petitioner was powerless to prevent Ms. Boyer from testifying for the State if she so desired and if the State elected to call her as a witness. We note, though, that had the trial court granted the severance and had Ms. Boyer testified as a mere witness in a separate trial, her testimony would have had a different impact than it did in the proceeding that took place, in which she was seated at the defense table with the Petitioner and in which the Petitioner had to defend against both the prosecutor's and his codefendant's attorney's allegations and arguments. In the joint trial, the State and Ms. Boyer's defense both characterized the Petitioner as an abusive, intimidating man and characterized Ms. Boyer as being dominated by him and physically incapable of causing the victim's injuries. The Petitioner's credibility and character and the question of his guilt were attacked not only by the prosecutor, but also Ms. Boyer's defense counsel. The alignment of the State's and Ms. Boyer's theories and the State's reliance on her testimony to make its case against the Petitioner conferred the State's endorsement upon her reliability and credibility in a profound manner. Had the cases been severed, the Petitioner would not have had to defend against the allegations of Ms. Boyer's defense in addition to those of the State.

It is worthwhile to emphasize that "[e]ven 'mutually antagonistic' defenses do not per se require a severance, though they may in some circumstances." *State v. Gosnell*, 62 S.W.3d 740, 749 (Tenn. Crim. App. 2001); *see also Zafiro v. United States*, 506 U.S. 534, 537-38 (1993); *State v. Ensley*, 956 S.W.2d 502, 509 (Tenn. Crim. App. 1996) ("While 'mutually antagonsitic' defenses may mandate severance in some circumstances, they are not prejudicial per se."). We do not view mere mutual antagonism of defenses in the petitioner's case, had it been known before the trial, as a sufficient reason for a severance. The circumstances of this case, and particularly the surprise to the petitioner and the resulting difficulty in reformulating a defense strategy, justify our conclusion that a severance was required.

We conclude that the State's unanticipated calling Ms. Boyer as its own witness and the presence of Ms. Boyer's attorney as an additional source of disparagement of the Petitioner's credibility and character made it essential for the defendants to have been tried separately in order to ensure the Petitioner received a fair trial. Because the Petitioner established both deficiency and prejudice, the post-conviction court did not err in granting relief on this basis.

## II

The second component of the State's appeal relates to the post-conviction court's granting relief based upon trial counsel's failing to object to the State's alleged vouching for and bolstering of Ms. Boyer's testimony, particularly during its closing arguments. In a related issue, the Petitioner contends that the court erred in failing to grant relief on his claim that counsel provided ineffective assistance for failure to object to repeated instances of prosecutorial misconduct. Because these issues involve related facts, we will consider them together.

As we have stated, Ms. Boyer testified for the State that the Petitioner physically abused the victim. She likewise testified about his poor parenting skills and abusive conduct toward the victim beyond the facts of the offense and his lack of fiscal stewardship relative to his family. After Ms. Boyer testified, the prosecutor announced that the State was pursuing a conviction of the Petitioner as the person principally responsible for the charged offense and was seeking a conviction of Ms. Boyer as an aider and abetter, meaning the State relied upon a theory of criminal responsibility for the conduct of another. *See* T.C.A. § 39-11-402 (2014). The strategy employed by both the prosecution and Ms. Boyer's defense characterized the Petitioner as the perpetrator and Ms. Boyer as physically incapable of causing the victim's injuries.

In the State's closing argument, the prosecutor argued that the jury knew what happened to the victim because Ms. Boyer told them and that "many reasons" existed to believe her. The prosecutor also argued that Ms. Boyer was young, small, and recovering physically from childbirth, and that it was not logical to conclude she was able to throw the victim forcefully against a wall.

Ms. Boyer's attorney's closing argument generally disparaged the Petitioner, stating that the Petitioner "robbed Lisa Boyer of her youth" and dated and impregnated her when she was seventeen. Ms. Boyer's attorney also argued that the Petitioner and his client "had to live at the mercy of the taxpayers and her family." Ms. Boyer's attorney also argued that the Petitioner lied about his income in his application for public assistance, that the Petitioner was not a caring father and had not called regularly to check on his daughter with Ms. Boyer who was in DHS custody, and that the jury should return a verdict reflecting justice for the victim, Ms. Boyer, and their daughter.

In the State's rebuttal argument, the prosecutor contested the defense argument that the Petitioner was a good parent who loved his children by arguing that the Petitioner put up a "good front" at the hospital around his own parents regarding his concern for the victim, that the Petitioner had been more concerned about his injured finger than the victim's flu-like

-19-

symptoms that had existed for several days, and that the Petitioner had advantages in life that the victim was not afforded. The prosecutor argued that the Petitioner had the benefit of several jobs but that he never remained employed, that he had two children with different women, that his family provided financial support, that he allowed Ms. Boyer to receive AFDC and food stamp benefits for their child, that he untruthfully stated his income on his application for AFDC and food stamp benefits for the victim, and that although he was released on bond, he only called to check on his daughter two or three times in the year that the child was in DHS custody. The prosecutor argued that the victim's autopsy could not show a broken heart and asked, "Now, is he going to go free for that?" The prosecutor ended his rebuttal argument with the following:

> There was a man long ago, a teacher. He was walking along a dusty road and others were following him. His closer followers called him rabbi. Teacher. And beside his close followers, there was a big crowd that followed him nearly everywhere he went. And as the man, the leader, the teacher, went along, he heard his close followers arguing amongst themselves. And he turned around and he said - why are y'all arguing? And they were sheepish. Because they didn't want to tell the rabbi why they were arguing. But he pressed them. He said - tell me, why are you arguing. And they said - well, rabbi, we just were wondering in the kingdom that you are going to set up, which one of us will be the greatest - who will be number one, and who will be number two, who will be on your right hand and who will be on your left hand? And the teacher, he kind of took a test, he said - whoever - whoever would be greatest, he must be last and the least, and whoever - whoever would be great among you, must be the servant of all. And then he turned around and in the crowd that was gathered around him which is always - almost always there, he found a little child, a boy. He took the little boy and he sat the little boy in the midst of his close followers and he said - whoever receives a little one like this, receives me. Whoever receives a little one like this, receives me. But you know, he didn't leave it there. He didn't leave it there. He went on to say sternly - but anyone, anyone who causes one of these little ones to stumble, it would be better for him if a millstone was put around his neck and he was drowned in the sea. The good rabbi said that.

> Members of the jury, we simply ask for justice. Let justice come down like the mighty waters.

The trial record reflects that trial counsel did not object at any point to the State's or Ms. Boyer's closing arguments. In the appeal of the conviction, the Petitioner raised as plain error an issue regarding the propriety of the district attorney general's Biblical argument, but

he did not raise an issue regarding other aspects of the argument. The court characterized the impropriety of the Biblical argument as "obvious" but declined to recognize plain error because it could not conclude that the improper argument affected the verdict to the Petitioner's prejudice given the strength of the evidence. *See Curtis Cecil Wayne Bolton*, 1999 WL 93107, at *18-19.

Relative to trial counsel's failure to object to the alleged vouching and bolstering, the post-conviction court found:

> In this case, the state's attorney did not overtly express his personal belief in Ms. Boyer's veracity. But the record shows without any doubt the prosecuting attorney's urgency in having the jury believe her testimony. He told them in great detail why they should believe her final story, and his act of dropping the murder charges against her immediately after she finished her testimony couldn't have said any clearer: "I believe she was telling the truth."

> Trial counsel did not object to the prosecutor's conduct.

> In order to establish an ineffective assistance of counsel claim for failing to object to prosecutorial misconduct, the misconduct must be "plain enough for a minimally competent counsel to have objected." *Washington v. Hofbauer*, 228 F.3d 689, 698 (6th Cir. 2000). The conduct described in the record meets that test. Ms. Boyer's testimony was the only proof on which the jury could have based a verdict of first degree murder. The state had to have the jury believe her, despite the conflicting testimony she had previously given.

> After concluding that the prosecutor's comments were improper, the Court must then conclude that the comments "so infect[ed] the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright*, 477 U.S. 168, at 181 (1986). The Court concludes that the record satisfies that test, also.

The post-conviction court then concluded:

> The Court finds and holds that the conduct of [the Petitioner's] trial attorney in (1) not seeking a severance when it became obvious that Ms. Boyer was going to incriminate him, and (2) in not objecting to the State's bolstering and vouching for Ms. Boyer's testimony fell below the standard of care.

-21-

The court also finds and holds that but for the deficient performance there is a reasonable probability that the result of the proceedings would have been different.

Relative to ineffective assistance in failing to object to prosecutorial misconduct, the post-conviction court's order states:

Grounds (7) and (8) allege prosecutorial misconduct related to a juror /assistant District Attorney relationship not disclosed during *voire dire*, Ground (9) alleges prosecutorial misconduct by making improper statements to the jury, and ground (10) alleges ineffective assistance of counsel for failure to object to the prosecutorial misconduct.

The Court finds that these grounds are now foreclosed because they were previously determined by the Court of Criminal Appeals and found not to amount to reversible error. . . .

Since the grounds were not prejudicial to the petitioner's case it would not be ineffective assistance of counsel to fail to object to them (ground 10).

## A.    **Failure to Object to Vouching and Bolstering**

We consider, first, the post-conviction court's grant of relief for trial counsel's failure to object to alleged vouching and bolstering of Ms. Boyer's testimony. Vouching occurs when a prosecutor expresses personal opinion that a witness is telling the truth. *See, e.g.*, *State v. Sexton*, 368 S.W.3d 371, 419-20 (Tenn. 2012); *State v. Goltz*, 111 S.W.3d 1, 6-7 (Tenn. Crim. App. 2003). Our supreme court has repeatedly condemned a prosecutor's expression of personal belief in the truth or falsity of evidence. *See, e.g.*, *Sexton*, 368 S.W.3d at 420. The term "bolstering" generally refers to the admission of a witness's prior consistent statement. *See State v. Hodge*, 989 S.W.2d 717, 725 (Tenn. Crim. App. 1998); *State v. Robert D. Walsh*, No. W1999-01473-CCA-R3-CD, 2001 WL 91949, at *8 (Tenn. Crim. App. Jan. 30, 2001) ("'[B]olstering' generally refers to the situation in which the state offers a prior consistent statement of the victim to enhance the credibility of her testimony at trial."), *perm. app. denied* (Tenn. June 4, 2001). Although bolstering is not permitted as a general proposition, it may be allowed to rehabilitate the credibility of a witness whose testimony is impeached during cross-examination as being a "recent fabrication" or "deliberate falsehood." *State v. Frederick Herron*, — S.W.3d —, —, No. W2012-01195-SC-R11-CD, 2015 WL 1361262, at *11 (Tenn. Mar. 26, 2015).

We note, first, that the conduct upon which the post-conviction court granted relief does not fit the definition of bolstering because the Petitioner did not complain in the petition of admission of prior consistent statements to bolster the credibility of Ms. Boyer's testimony. We will consider whether the State improperly vouched for her testimony.

In that regard, we note the post-conviction court's erroneous finding that the State announced at the end of Ms. Boyer's testimony that it was dropping the murder charge against her. The trial record reflects that the State announced its intent relative to Ms. Boyer to pursue a first degree murder conviction under a theory of criminal responsibility for the conduct of another. *See* T.C.A. § 39-11-402 (2014). In his brief, the Petitioner characterizes the State's action after Ms. Boyer's testimony as "downgrad[ing] to some sort of 'bystander' status." However, Ms. Boyer continued to face the prospect of a conviction of first degree murder, and the record reflects that the jury was instructed accordingly. Nevertheless, we acknowledge that the prosecutor's announcement regarding the State's theory relative to Ms. Boyer immediately after her testimony inevitably would have conferred some indicia of the State's belief in her testimony.

We have considered the prosecutor's conduct relative to Ms. Boyer's testimony, his vigorous cross-examination of defense witnesses, and his closing arguments. Relative to the question of vouching, we conclude that despite the theme that Ms. Boyer was believable and the Petitioner was not, the district attorney limited his argument in this regard to highlighting facts why Ms. Boyer's testimony should be accredited and why the Petitioner's should not. The district attorney did not make inappropriate statements about his personal belief in Ms. Boyer's testimony. We are concerned by the tenor of the prosecution's closing arguments, and we will consider them further below. That aside, we have not found in the trial record, nor has the Petitioner pointed us to, any express statement of the prosecutor's personal belief in Ms. Boyer's testimony. We conclude that the evidence preponderates against the post-conviction court's determination that the prosecutor improperly vouched for Ms. Boyer's credibility. To the extent that the post-conviction court granted relief on this basis, it erred.

## B.    Failure to Object to Other Alleged Prosecutorial Misconduct

The Petitioner contends that the post-conviction court erred in denying relief on his ineffective assistance of counsel claim relative to trial counsel's failure to object to multiple instances of prosecutorial misconduct during the trial, which he contends were magnified by the role of Ms. Boyer's attorney in attacking him and his character. The Petitioner identifies the following as prosecutorial misconduct:

1.   Direct examination of Ms. Boyer about the Petitioner's poor parenting, his sporadic work history, and his failure to provide financially for his family's necessities.

2.   Cross-examination of defense witnesses about the veracity of the Petitioner's statement about his income on an application for governmental assistance and cross-examination of the Petitioner's relatives, for whom the Petitioner worked, about their business record-keeping practices.

3.   Cross-examination implying that the Petitioner was not a good father by asking whether he had called to check on his daughter since she had been placed in DHS custody and by asking if he had called Ms. Boyer on the night of the victim's injuries to see if she or the children needed anything.

4.   Closing arguments designed to inflame the jury's passions.

The State responds that counsel was under no compulsion to object to the alleged instances of misconduct and that the Petitioner has not established a reasonable probability of a different result had counsel objected.

As we have stated, the post-conviction court found that prosecutorial misconduct was raised in the appeal of the conviction and that although error occurred, it did not rise to the level of plain error requiring reversal. In disposing of the post-conviction claim of ineffective assistance of counsel for failure to object to prosecutorial misconduct, the court concluded that this court's determination of no reversible error meant that trial counsel's performance could not have been deficient in failing to object. We note that the issue raised in the direct appeal was prosecutorial misconduct, whereas the issue raised in the post-conviction action is ineffective assistance of counsel in failing to object to prosecutorial misconduct. We likewise note that the Petitioner raised allegations in the post-conviction action of instances of prosecutorial misconduct at the trial that were not considered by this court in the appeal of the conviction. We do not view the previous determination of no reversible error on limited allegations of prosecutorial misconduct to foreclose consideration of counsel's effectiveness in failing to object to the alleged prosecutorial misconduct.

Regarding the failure to object to testimony about the Petitioner's previous physical abuse of the victim, his intimidation of Ms. Boyer, and his failure to support his family, we note that the Petitioner's defense included the theory he was a good parent. Regarding the evidence of his dishonesty about his income, we note that he placed his credibility in question

by testifying.  We acknowledge, though, that some of the unfavorable evidence went beyond the bounds of relevance and that counsel did not object to the prosecutor's questions that elicited the evidence.  At the post-conviction hearing, trial counsel was not asked why he did not object to these matters.  Because counsel was not asked about his lack of objections, we are unable to assess whether counsel's lack of objections was a matter of trial strategy, and in any event, we will not scrutinize counsel's strategic and tactical decisions absent clear and convincing evidence they were uninformed due to counsel's inadequate preparation.  *See, e.g.*, *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982).

Regarding the closing arguments, we again recognize that this court stopped short of recognizing plain error in the previous appeal but determined that the district attorney's Biblical references were improper.  We believe the argument regarding the autopsy report's not showing a broken heart and the query whether the Petitioner was going to go free for breaking the victim's heart were improper because they were designed to inflame to the jury's emotions.  *See Goltz*, 111 S.W.3d at 6 (stating that a prosecutor "should not use arguments calculated to inflame the passions or prejudices of the jury") (quoting *Standards Relating to the Prosecution Function and the Defense Function*, §§ 5.8-5.9, Commentary (ABA Project on Standards for Criminal Justice, Approved Draft 1971)).  We also note the references to the Petitioner's application for public assistance.  While the Petitioner's false statement on a governmental assistance application regarding his income was relevant evidence to impeach his credibility, argument that the Petitioner did not work regularly and forced Ms. Boyer, the victim, and his child with Ms. Boyer to live on public assistance was inappropriate to the extent that it relied upon economic prejudices that the jurors might have harbored.  *See id.* at 7.  We conclude that proper bases for objection by counsel existed.

Determining that objections could have been made appropriately, however, does not necessarily mean trial counsel performed deficiently in failing to make them.

This court has previously considered "whether the failure to object during a closing argument is generally sufficient for a showing of ineffective assistance of counsel."  *Derek T. Payne v. State*, No. W2008-02784-CCA-R3-PC, 2010 WL 161493, at *15 (Tenn. Crim. App. Jan.15, 2010), *perm. app. denied* (Tenn. May 10, 2010) (citation omitted); *see Lemar Brooks v. State*, No. M2010-02451-CCA-R3-PC, 2012 WL 112554, at *14 (Tenn. Crim. App. Jan. 11, 2012), *perm. app. denied* (Tenn. May 16, 2012).  Trial counsel's decisions of whether to object to the arguments of opposing counsel "'are often primarily tactical decisions.'"  *Lemar Brooks*, 2012 WL 112554, at *14 (quoting *Derek T. Payne*, 2010 WL 161493, at * 15).  Trial counsel could refrain from objecting for several valid tactical reasons, including not wanting to emphasize unfavorable evidence.  *Derek T. Payne*, 2010 WL 161493, at * 15.  As a result,

"testimony from trial counsel as to why he or she did not object to the allegedly prejudicial remarks is essential to determine whether trial counsel was ineffective." *Lemar Brooks*, 2012 WL 112554, at * 14. Absent testimony from trial counsel or evidence indicating that counsel's decision was not tactical, "we cannot determine that trial counsel provided anything other than effective assistance of counsel." *State v. Leroy Sexton*, No. M2004-03076-CCA-R3-CD, 2007 WL 92352, at *5 (Tenn. Crim. App. Jan.12, 2007), *perm. app. denied* (Tenn. May 14, 2007).

*Gregory Robinson v. State*, No. W2011-00967-CCA-R3-PD, 2013 WL 1149761, at *79 (Tenn. Crim. App. Mar. 20, 2013), *perm. app. denied* (Tenn. Aug. 14, 2013).

At the post-conviction hearing, the Petitioner's attorney asked trial counsel, "Do you recall if you objected at all during the trial?" Counsel responded, "I'm sure I did if there was something to object to. I hope I did." The Petitioner's attorney then asked if counsel objected to Ms. Boyer's testifying, and counsel stated he did not recall. Aside from the question about whether he objected to Ms. Boyer's testifying, counsel was not asked about his rationale for objecting or not objecting to any specific matter. As a result, we are unable to determine whether counsel chose not to object to the State's closing argument as a valid, informed trial strategy, such as to avoid calling greater attention to it.

Upon review, we conclude that the Petitioner failed to establish that trial counsel's failure to object to irrelevant evidence and improper argument was deficient performance. Counsel was not asked to explain any of his decisions not to object to the evidentiary matters, aside from his being asked whether he objected generally to Ms. Boyer's testifying. He likewise was not asked to explain his decision not to object to the State's closing argument. The record does not support a conclusion that counsel's lack of objections was a product of uninformed trial strategy.

We conclude, as well, that the Petitioner did not establish prejudice. Although trial counsel did not object when the prosecution cast the Petitioner in an unflattering light and made inappropriate arguments, we cannot overlook that the medical evidence was inconsistent with the Petitioner's theory the victim was injured in a highchair fall and that the medical evidence supported the State's theory that the victim was thrown into a wall. Ms. Boyer testified that the Petitioner caused the injuries, and a neighbor testified about hearing a thump and seeing a man and a woman running in the trailer the Petitioner shared with Ms. Boyer and the children. The proof established the Petitioner's guilt of the offense. He cannot establish prejudice from any lack of objections to evidentiary matters or closing argument. He is not entitled to relief on this basis.

The Petitioner contends that the post-conviction court erred in denying post-conviction relief on his ineffective assistance claim relative to trial counsel's failure to investigate and develop expert medical proof. This court's opinion in the appeal of the conviction summarized the State's medical proof:

> Dr. Cleland Blake, the assistant chief medical examiner for Tennessee, testified that he performed an autopsy on the victim on November 23, 1995. He said the victim had many bruises of differing ages on his body. He said the victim had fresh bruises covering the left side of his face, a bruise under the high right part of his scalp, and a broken right collarbone. He said the victim had deep bleeding under his scalp at the top of his head and in the right side of his brain under the skull. He said that this type of bleeding is caused by an impact to the left side of the head which forces the brain across the skull and causes it to bounce against the other side of the skull, tearing blood vessels and causing the bleeding. He said the victim had swelling and compression of the brain that pushed the brain stem down to the hole in the base of the skull and cut off the victim's blood supply, ultimately causing his death.

> Dr. Blake testified that the victim's fatal injury was on the left side of the victim's face on his jaw, left cheek, temple, and behind his left ear. He said the injury was caused by the blunt impact of a surface that pressed the left ear against the head. He said that when the victim arrived at the emergency room at 11:00 p.m., the victim was unconscious. He said the injury would have occurred two to three hours earlier, not immediately before he was brought to the hospital. He said the victim had fresh injuries on the left side of his face, the back of his head, the back of his right shoulder, and his buttocks. He said that the bruise on top of the victim's head was consistent with the victim falling out of a highchair, but it did not cause his death. He said it is inconceivable that the victim's internal bleeding or brain injuries resulted from falling out of a highchair, and to receive such injuries from a fall, the victim would have had to fall more than twenty feet. He said the victim's injuries were consistent with child abuse, and the victim's fatal injury had to be from a very forceful blunt impact between an object and the victim's head. He said that after the victim received the injury, he would have gradually lost consciousness, which could have caused him to fall out of the highchair. He said the injuries on the victim's back and right shoulder and his broken collarbone show that there were definitely two impacts.

On cross-examination, Dr. Blake testified that the victim had some bruising where life support equipment was attached, but he said the bruising was different from the victim's injuries. He said that attempts to resuscitate the victim by slapping him hard on the face would not have caused the victim's injuries or his death. He said the victim's bruises that were one to two days old did not contribute to his death.

. . . .

Dr. Peter V. Claussen testified that he was on duty at the University of Tennessee Hospital in Knoxville that night. He said the victim was flown to UT Hospital from Campbell County by LifeStar. He said the victim's symptoms were consistent with a blunt, closed-head trauma, and the victim had massive bleeding inside the brain. He said the victim had other injuries consistent with child abuse. He said the victim's injuries could not have been caused by a fall from a highchair. He said the fall would have had to be from about twenty feet. He said the victim's injuries were consistent with him having been thrown into a wall with substantial force, and the fatal injuries occurred one to two hours before the victim was brought to the emergency room. He said the victim may have lost consciousness from the blow, regained consciousness, then deteriorated again. He said it would take the victim one to two hours after the injury to become cold, to have a weak pulse, and to be near death.

On cross-examination, Dr. Claussen testified that it would be possible for a strong, young adult male to throw the victim into a wall covered with paneling. He said that such a force would cause the injuries the victim received.

*Curtis Cecil Wayne Bolton*, 1999 WL 93107, at *2-4.

After reviewing this trial proof and receiving the post-conviction hearing testimony of Drs. Davis and Mileusnic-Polchan, the post-conviction court stated in its final order:

The petitioner alleges that trial counsel should have searched for a medical expert to refute the conclusions of the state's experts who stated their conclusions about [the victim's] injuries.

The critical evidence from the state's experts (viewed in hindsight) involved the time the fatal injuries occurred, the force that was used, and

-28-

whether a petite woman, a short time after giving birth herself, could have inflicted the injuries that caused the child's death. Both experts concluded that a fall from a high chair would not have caused the child's injuries.

At the hearing on the post conviction petition, counsel for the petitioner presented an eminent medical expert who had reviewed the trial transcript, the autopsy report and accompanying pictures. He agreed with the cause of death (blunt trauma to the head) but disputed the conclusion about the amount of force used (a fall from a one or two-story building). He admitted that he couldn't say how or when the trauma occurred. His opinion was that it could have been caused by hitting the wall, or the floor, or by being hit by a moving object. His opinion also was that a petite woman could have thrown the child into the wall and caused his death.

The Court concludes that the facts in this record do not satisfy the second prong of the *Strickland* test: a reasonable probability that with the expert's evidence the result of the criminal trial would have been different. The only part of the state's expert evidence that is absolutely controverted by the expert who testified at the post-conviction hearing was the opinion that the force causing the victim's injuries was equivalent to a fall from a one or two-story building.

Although the new opinion expressed a belief that the injuries could have been caused by a much smaller force, even the new expert hesitated to conclude that a fall from a high chair would have been sufficient.

Finding an expert who would have implicated Ms. Boyer was the last thing on counsel's mind before the criminal trial. As far as he and Mr. Bolton were concerned, the two defendants were "on the same page."

The Court rejects this argument as a ground for post conviction relief.

The evidence at the post-conviction hearing showed that although trial counsel met with Dr. Blake before the trial, counsel did not seek an independent expert's review of the medical evidence. Both Dr. Davis, the Petitioner's medical expert, and Dr. Mileusnic-Polchan, the State's medical expert, agreed with Dr. Blake regarding the cause and manner of death. Dr. Davis and Dr. Mileusnic-Polchan both questioned Dr. Blake's use of the analogy of the force required to cause the victim's injuries being equivalent to a fall from one to two stories. Dr. Davis said the victim's injuries could have resulted from a fall from a highchair. He thought this scenario was possible but was highly unlikely. Dr. Mileusnic-

Polchan found it "inconceivable" that a highchair fall would have resulted in injuries of the magnitude of the victim's. She said, though, that current medical knowledge provided that short falls might occasionally result in deadly trauma. Dr. Mileusnic-Polchan excluded childhood play as the origin of the victim's injuries based upon their distribution and extent. Dr. Davis said the victim's injuries were consistent with a number of scenarios other than the theory advanced by the State, although he thought Dr. Blake had alluded in his testimony to the possibility of other mechanisms of injury. Dr. Davis questioned Dr. Blake's opinions regarding the ages of some of the victim's bruises and said determining the age of a bruise was considered problematic pursuant to current medical knowledge. Dr. Davis said that even at the time of the trial in the 1990s, he would have been uncomfortable providing opinion testimony about the age of a person's bruises. Dr. Mileusnic-Polchan was less concerned about Dr. Blake's testimony about the ages of the bruises and noted that Dr. Blake microscopically examined tissue, which was more accurate than determining bruise age by visual inspection. Dr. Mileusnic-Polchan said that most of the victim's bruises occurred about twenty-four hours before his death, although some could have been as much as one week old.

Regarding the timing of the victim's head injury, Dr. Davis said Dr. Blake's testimony that "at least an hour or so could have passed" between the victim's sustaining a head injury and the onset of symptoms was speculative and was not scientifically supported. Dr. Davis said it was impossible to pinpoint the time of the victim's head injury. Dr. Davis disagreed with Dr. Blake's opinion that the victim's head injury could have occurred suddenly from a massive brain bleed and said no guidelines existed regarding the amount of time a child might live after a massive brain bleed. In Dr. Mileusnic-Polchan's opinion, the victim's head trauma and clavicle fracture occurred twenty-four to forty-eight hours before his death, and she said that had she been called as a witness, she would have testified that the injuries occurred in the morning, around noon, or early afternoon of November 22, the day before the victim's death.

In Dr. Davis's opinion, no forensic evidence showed that a 5'8", 150-pound man was the perpetrator, nor did any forensic evidence exclude the possibility that the perpetrator was a petite woman. In his opinion, it would be possible for a petite woman to throw the victim into a wall with sufficient force to cause the injuries. He said that in other cases in which he served as an expert witness, he had sometimes been allowed to remain in the courtroom to evaluate other medical testimony and that he helped attorneys formulate cross-examination questions. Despite their disagreements with some of Dr. Blake's opinions, both Dr. Davis and Dr. Mileusnic-Polchan agreed with significant components of Dr. Blake's testimony and both said they did not think Dr. Blake's testimony was misleading.

We note that the post-conviction court did not make an explicit finding regarding whether trial counsel's performance was deficient in failing to investigate the medical evidence. The record reflects that counsel met with Dr. Blake and that Dr. Blake was cooperative in answering counsel's questions. At the trial, Dr. Blake testified that although the victim had a non-fatal bruise on top of the victim's head that was consistent with falling from a highchair, it was "inconceivable" that the victim's internal bleeding or brain injuries resulted from a highchair fall. Dr. Blake said that for the victim's fatal injuries to have occurred in a fall, the victim would have had to fall more than twenty feet. He said the victim's injuries were consistent with child abuse, and the victim's fatal injury had to be from a very forceful blunt impact between an object and the victim's head. The post-conviction evidence shows that Dr. Blake was available to discuss the evidence with counsel and that Dr. Blake's opinions were inconsistent with the defense theory. The failure to ascertain or understand the extent of Dr. Blake's opinions before the trial constituted deficient performance. Had counsel anticipated that the chosen defense was inconsistent with the State's medical proof, he would have known that further investigation into an alternative defense was warranted. In that regard, an appropriate inquiry into Dr. Blake's opinions should have prompted counsel to seek an independent review of the medical evidence. In addition to providing an independent review, a defense expert could have assisted counsel in preparing for cross-examination.

We note that although Ms. Boyer initially gave statements to law enforcement that mentioned the fall from the highchair when the Petitioner was not home and omitted any allegations of the Petitioner's abusing the victim, she later gave a statement before the autopsy report was available in which she said the Petitioner threw the victim against a wall. *Curtis Cecil Wayne Bolton*, 1999 WL 93107, at *13. We have reviewed Ms. Boyer's pretrial statements and her trial testimony. In her initial statements, she appeared to believe the victim's highchair fall caused his death, and she testified at the trial that she was told initially the police believed the highchair fall and her resuscitation efforts caused the victim's death. Although her final pretrial statement to law enforcement indicated that the Petitioner whipped the victim vigorously and threw him onto a bed and that the victim hit his head on a wall when he was thrown on the bed, Ms. Boyer's trial testimony provided greater detail about her hearing a thump in the victim's bedroom, going to the bedroom, and seeing the Petitioner throw the victim against the wall and cause a second thump. Ms. Boyer's succession of pretrial statements, culminating in her disclosing some of the Petitioner's abuse of the victim, pointed to the need for further investigation by counsel of the medical proof and the planned theory of defense.

The expert testimony at the post-conviction hearing regarding the timing of the injuries likewise highlighted the need for inquiry beyond Dr. Blake's opinions. We acknowledge the lack of proof that trial counsel could have discovered, before the trial, that

-31-

Ms. Boyer would testify for the State. We recognize that Ms. Boyer's defense may have planned to surprise the Petitioner with their strategy when the trial began. We conclude, though, that counsel's investigation of the medical proof was deficient performance.

The remaining question is whether the Petitioner established that he was prejudiced by trial counsel's failure to obtain a defense medical expert. In that regard, we note that the expert medical proof at the post-conviction hearing did not contradict Dr. Blake's testimony regarding the cause and manner of death. Like Dr. Blake, Dr. Mileusnic-Polchan thought the possibility of the victim's injuries being sustained in a fall from a highchair was inconceivable, and Dr. Davis thought it was extremely unlikely. We acknowledge that as the case developed with Ms. Boyer testifying the Petitioner injured the victim by throwing the victim against a wall rather than in a highchair fall, the timing of the injury became significant. Although a defense medical expert might have been able to challenge Dr. Blake's testimony that the injury occurred around one to three hours before the victim presented at the emergency room, the evidence nevertheless overwhelmingly points to the Petitioner as the person who fatally injured the victim. Ms. Boyer implicated the Petitioner, and her testimony was corroborated by the neighbor's testimony about hearing thumps come from the Petitioner and Ms. Boyer's trailer and seeing a man and woman run back and forth in the hall of the trailer. Ms. Boyer's trial testimony corroborated that the neighbor could have seen into the trailer in the manner the neighbor described. As this court noted in the appeal of the Petitioner's conviction,

> The medical examiner testified that the victim's injuries did not come from a highchair fall but rather from a strong impact to the victim's head with a blunt object. It is significant that when Ms. Boyer finally told Detective Smith about the defendant slamming the victim into the wall, it was before the autopsy results, which supported Ms. Boyer's statement, were available.

*Curtis Cecil Wayne Bolton*, 1999 WL 93107, at *13. We conclude that despite counsel's deficient investigation of the medical proof, the post-conviction court did not err in concluding that the Petitioner failed to show prejudice through proof of a reasonable probability of a different result at the trial. The Petitioner is not entitled to relief on this basis.

**IV**

The Petitioner contends that the post-conviction court erred in denying relief on his ineffective assistance of counsel claim relative to trial counsel's advice regarding the plea offer and the amount of time the Petitioner would be required to serve in prison if he were convicted of first degree murder. The court found the following:

-32-

The Court does find that [the Petitioner] was given erroneous information. But he always adamantly insisted he was innocent. His mother was present when the offer was being considered and she insisted that he turn it down. His sister-in-law, who was present, heard all the discussion and testified that the erroneous information was given but she clearly remembered her mother-in-law's insistence.

Another circumstance that bears on [the Petitioner's] credibility on this issue is the fact that he did not raise the issue in his first or second petition for relief. The sister-in-law testified that she learned the bad news two or three days after he was convicted. [The Petitioner] himself testified that he learned the bad news while he was at the classification center in Nashville before the case went up on direct appeal. Yet when he filed his first petition for post-conviction relief (approximately four years later) he did not raise that issue. The Court is not convinced that [the Petitioner] rejected the state's offer because of the erroneous advice of his trial counsel.

Upon review, we conclude that the evidence does not preponderate against the post-conviction court's factual finding that the Petitioner was given erroneous advice. The failure to provide the Petitioner with accurate information about parole eligibility and the required minimum service of the sentence was deficient performance.

The Petitioner is not entitled to relief, though, unless he has established that he was prejudiced by counsel's deficient performance. The post-conviction court's order reflects that the court was influenced by two factors in rejecting the Petitioner's testimony as credible regarding whether he would have accepted the plea offer: (1) his insistence he was innocent and his mother's insistence he not accept the offer at the plea offer meeting, and (2) his failure to raise the issue earlier than he did.

Regarding the events of the plea offer meeting, Ms. Stalnaker testified that the Petitioner's mother told the Petitioner and trial counsel that the Petitioner would not accept the offer. Ms. Stalnaker said that the Petitioner's mother did most of the talking and that the Petitioner did not say much in the meeting. The Petitioner testified that his mother said he would refuse the offer and go to trial. He said the decision was his and that he told counsel he would not accept any offer and wanted to go to trial. Counsel testified that the Petitioner said he was not guilty and wanted to go to trial. He specifically recalled the Petitioner's saying he was going to trial for the victim. Mr. Beaty corroborated counsel's testimony that the Petitioner said he was going to trial for the victim. The evidence shows that although the Petitioner's mother stated that the Petitioner would not accept the plea offer, the Petitioner made his own decision and communicated his intent to counsel. The evidence also shows

-33-

that the Petitioner was adamant in his rejection of the offer, albeit based upon erroneous advice.

Regarding the post-conviction court's evaluation of the Petitioner's credibility, in part, based upon the Petitioner's failure to raise the issue sooner, a review of the procedural history informs our analysis. Permission to appeal the conviction was denied in September 1999, and the Petitioner filed his pro se post-conviction petition in September 2000. Counsel was appointed in 2000 but permitted to withdraw in 2001 after filing a motion stating he had a conflict of interests, and new counsel was appointed. In late 2002, the second attorney appears to have filed a motion to amend the petition. A copy of the document that does not contain a file stamp appears in the technical record, and the certificate of service reflects the date as December 27, 2002. The motion alleged:

> That during the course of the investigation [of the Petitioner's post-conviction claims], that present counsel did discover that during plea negotiations that an offer of 12 years to serve on a Class A felony was presented to the Defendant and that Counsel advised the Defendant that if the matter went to trial as charged and that the Defendant was convicted and Sentenced to Life with Parole, that the Defendant would only have to serve 25 years.

Counsel sought permission to amend the petition to add an additional ground for relief on this basis. The record does not reflect that the court ruled on the motion or that the second attorney filed an amended petition. The second attorney was permitted to withdraw in September 2005 after the Petitioner filed a complaint against him with the Board of Professional Responsibility, and new counsel was appointed. The record reflects no further action until October 2007, when the Petitioner filed a pro se motion to have his counsel removed. The Petitioner was brought to court in February 2008 in order to meet with his third attorney, and the record does not reflect further action until April 2010, when the Petitioner filed a second motion to have his counsel removed. The record next reflects two pro se motions to have counsel removed in February and April 2012. Around this time, the Chief Justice of the Tennessee Supreme Court designated a senior judge to hear the case. In July 2012, the post-conviction court appointed the Petitioner's present attorney, and she filed an amended petition in November 2012 that included allegations regarding the erroneous plea advice.

Upon review of the lengthy and complex procedural history of this case, we disagree with the post-conviction court that a layman's failure to raise the issue in a pro se post-conviction petition should reflect adversely upon his credibility regarding the decision he would have made if he had been properly advised about the sentence he faced if he rejected

the plea offer. We note that the Petitioner's first appointed attorney never filed an amended petition and was permitted to withdraw after he discovered a conflict of interests. The Petitioner's second attorney alleged that the issue existed in his motion to file an amended petition. We are gravely concerned by the long delays in this case. We note that the Petitioner appears to have been dissatisfied with his second and third attorneys, neither of whom filed an amended petition. Given these facts, we disagree with the post-conviction court that the Petitioner's delay in raising an issue regarding the erroneous advice reflects adversely upon his credibility.

The remaining question is whether the Petitioner showed clear and convincing proof he would have accepted the plea offer. Although the post-conviction court erroneously relied upon the Petitioner's delay in raising the issue, it was likewise unpersuaded by the Petitioner's testimony that he would have accepted the plea offer, given the evidence about the events of the plea meeting. The Petitioner's mother strongly desired that the Petitioner not accept the plea. The Petitioner expressed his desire to reject the offer and go to trial for the victim. The court rejected the Petitioner's testimony that he would have made a different decision if he had received the correct advice. In the face of the court's rejection of the Petitioner's testimony, we conclude that the Petitioner failed to establish his factual claim by clear and convincing proof and that the evidence does not preponderate against the court's determination. The Petitioner is not entitled to relief on this basis.

In consideration of the foregoing and the record as a whole, we affirm the judgment of the post-conviction court.

_____
ROBERT H. MONTGOMERY, JR., JUDGE